Good morning, Your Honors. May it please the Court, my name is Patrick McKinney, representing the appellant, Michael Korbholz, the trustee of the Waldman Children's Trust. We ask you at this point to reserve three minutes for rebuttal. This case involves an insured, Murray Waldman, who purchased this policy in 1986 when he was 58 years old. Over the course of the next 16 years, he paid premium to Great West. All told, he paid more than $50,000 in premiums. In 2002, Great West shifted processing of his payments over to a third-party processor, Transaction Applications Group. The dispute in this case involves the first payment processed under this policy by this third party. And as a result of their processing of the payment, Great West has attempted to forfeit the policy. We're asking the Court here today to reverse the judgment of the trial court. And today I intend to argue two points. Under the plain terms of the Great West policy, the term paid means mailed. All of the policy requires is that the insured pay the premium prior to the expiration of the grace period. It requires nothing more. Any other rule would be unworkable from the standpoint of the insured, because it would place a burden on the insured of guaranteeing the date that not only the Great West receives the payment, but also the date it deposits that payment into the policy value account, and also when it deducts the payment for cost of insurance. Would we have to read into the policy a mailbox requirement? No, Your Honor. Or a mailbox rule? No, Your Honor. I believe it's contained within the policy. Certain Great West uses the term paid with respect in the policy with respect to the obligations of the insured. For example, for the payment of premiums provision, which is page 92 of page 9 of the policy, the provision simply says premiums are to be paid to the company's United Quarters or one of its authorized agents. Similarly, in the grace period provision, which is on the same page, states only that if the premium due is not paid within the grace period, all coverage will cease. They limited it to the term paid. If Great West wanted to impose a receipt requirement, they drafted this policy. It was incumbent on them to insert those terms into the policy. For example, in the grace period provision, they should have said if the premium is not received prior to the expiration of the grace period, they could have said that. They could have said if the funds in the policy value account are insufficient as of the expiration of the grace period, they could have said that. Instead, they chose to simply say if the premium is not paid prior to the expiration of the grace period, then coverage will cease. Well, Mr. Korbholz must have thought it did, because one time he sent something by express mail or something overnight or something to meet one of the deadlines, didn't he? To meet one of the deadlines? Whereas he didn't on this last time. That's correct, Your Honor. There are three payments in the record. The 2000 payment, which was processed by Great West directly. The 2001 payment, also processed by Great West directly. One of those payments was sent by certified mail. The second by express mail. Certified mail, I would submit, is a little bit slower, actually, than regular mail. There was no agreement among the parties as to what a specific mode of delivery would be. And Great West has conceded here that mailing is acceptable. It could have been done by transfer of a wire, I suppose. Absolutely. You know, right then. There were a number of different options, but we would submit to the Court that payment by mail in the context of this policy was sufficient. And Great West has conceded in their brief that payment by mail and payment by check is a permissible method. They have simply attempted to insert a receipt requirement into the policy, into the grace period provision. Now the other way around. Counsel, this was mailed, what, four days before the due date? That's correct, Your Honor. This payment was made May 28th, 2002, and the grace period was set to expire as of May 31st, 2002. What was the due date, irrespective of the grace period? The way this policy works is there isn't a fixed due date for payment of premiums. There's simply a policy value account, which Great West maintains. The insured has no control over that policy value account. The insured simply sends a certain amount of funds, which are maintained in that insurance on a monthly basis. So the insured doesn't actually know that the funds in the policy value account are insufficient until Great West sends a notice. In this case, the notice was sent on April 3rd, 2002, received by the trustee on April 8th. And from that point, he had to do a number of things to get the funds into the trust and then sent to the insurance company. This trust has what's known as a crummy provision named after the Ninth Circuit decision, Crummy v. IRS, which gives the beneficiaries 30 days to withdraw any funds placed into the trust. So the trustee can't actually send out funds until he sends a notice out to the beneficiaries and gives them an opportunity to withdraw the funds. So there's a certain delay built into the trust after the trustee receives notice that a premium is due. So he can't simply send funds immediately to the company. So April 2 is the fund's due date? April 3rd was the date of the notice, which was received on April 8th. So April 8th was the first notice that the insured received. And when was payment mailed? Payment was mailed on May 28th. And when did the 60 days expire? May 31st was the date that the grace period was set to expire. OK, thank you. I was speaking about the terms of the policy that use the term paid. And the policy uses the term received in different contexts. And the context that it uses the term received are the actions taken by Great West at some point after the premium is paid by the insured. For example, the policy value account states that Great West doesn't need to do anything with a premium paid until received at the company's United States headquarters. And this is page 13 of the policy, page 96 of the record. So the payment of premiums provision allows an insured to pay either to the headquarters or to an authorized agent, but Great West need not do anything until actually received at the headquarters. So by this the company directed them to pay to this tag, which was an agent. Is that correct? That's correct. That's correct. So by definition, paid must occur at some point prior to the time it's received at the United States headquarters. Since there must be time for it to be sent to the agent, for the agent to process, paid and received can't be used interchangeably. Great West in their briefs on page 13 conveniently left out at the United States headquarters in their citation of the policy value account. And it's an important distinction in this policy. Great West has also argued that paid is the only reasonable interpretation of the policy. And one of the documents we submitted to the Court was the agreement between TAG and Great West. And in that agreement, in section 4.7e, and this is on page 241 of the record, in the section called Treatment of Payments, in that section they define paid to mean mailed. So at a minimum, it's reasonable for someone to believe that paid could mean mailed. It's certainly received is not the only reasonable interpretation of paid, as Great West argued in this case. Beyond the policy, the district court relied on the past due notices, which were sent out by Great West. We would submit that the terms of the policy here are clear. Great West sent out these past due notices, which do say that payment needs to be received by a certain date. And this was simply a unilateral attempt by Great West to vary the terms of the policy. Great West was free to put these terms in the policy, and the past due notices actually reflect a clarity that was left out of the policy itself. So the Court considered them, actually considered them to be the most persuasive support for the idea that Great West, when it used the word paid, it actually meant received. But that's actually not included within the policy itself, and they certainly could have put that in the policy to make it clear. And under the California rules of insurance interpretation, under both the AIU case and Bank of the West, if there's any ambiguity in the policy, the Court must look to the way the insured under the way the insurer understood the insured to understand the terms of the policy at the time that the policy was entered into. Here, the only past due notices in the record are beginning in 2000, more than, well, nearly 15 years after the policy was issued, and simply aren't relevant to the understanding of the parties at the time the contract was entered into. Beyond the plain terms of the policy, we would argue that the idea that paid means mailed is also consistent with both the California and Federal authorities that we've cited to the Court. For example, in Pearson v. John Hancock, a California case decided in 1968, while not specifically held by the Court, the Court simply assumed that the California claim that a mailed premium one day prior to the expiration of the grace period was sufficient. So in that case, mailing one day prior to the expiration was considered a payment of the premium. Similarly, in Nelson v. Guarantee Life Insurance, a 1933 California case, when the parties agreed that mail is an agreed-upon form of delivery, then mailing by the insured is a complete and irrevocable action on the part of the insured. And in that case, they also decided that paid – a payment was effective upon mailing. And that's at 131 Cal App, 669, page 673. It's also consistent with the California cases that have defined delivery. Delivery has been defined to mean release by the insured or release of control by the sender. In the Navritas case, Navritas v. Zurich, 5 Cal 3rd, at page 706, the California court did apply this definition of delivery. Similarly, in People v. LaRue, the court said that depositing a check in the post office, adjusted to payee, is sufficient delivery of the check. Great West has relied on a couple of cases, the Cornwell case and the Winn case, neither of which involved insurance and also neither of which involved the issue before this Court. Here, the question is, what is the definition of the term paid? And Cornwell – the issue in Cornwell was whether – who bears the risk of a check that gets lost in the mail. Here, it's undisputed that the check was received by Great West, they cashed it, they held on to it for a period of months. The Federal authorities are consistent. The Huizar case decided by the Ninth Circuit in 2001 has perhaps the clearest statement, insurance premiums are deemed paid upon mailing. And that's a very clear statement, and it's also consistent with our policy here. The second issue that I want to address to the Court is, if the Court agrees with the district court's interpretation of the policy that paid actually means received, then there's a tribal issue of fact between Great West actually received the payment. There were a total of two payments here processed by Great West. One, the payment at issue, the payment sent on May 28th, and then second, a payment sent for reinstatement sent on July 2nd after the policy had lapsed. The undisputed facts with respect to the first payment are the fact that it was mailed on May 28th, and that's at pages 269 and 270 of the record, and that Great West processed the payment on June 4th, which is at page 273. The stamp on the check put there by tag, Transaction Applications Group, does not indicate receipt. It simply indicates the date that they processed the payment. And the best evidence that there is a difference between when Great West actually receives the payment and when they process the payment is the second check that was sent by the trustee in this case. The July 2nd check was sent by FedEx on July 2nd. It was received by Great West on July 3rd, and they used a different stamp on the letter which says received July 3rd, and the check itself contains a stamp similar to the stamp on the first check, which is dated July 10th. So the check was actually processed one week after Great West received the check. And in the proceedings below, the district court accepted the declaration of one of the Great West's employees that tag was simply following its pattern of practice, its habit practice. But they didn't put any evidence before the Court that this payment was actually processed or that they processed any payments, in fact, in conformity with that pattern of practice. So that's the difference. Kennedy, in that adequate evidence, though, to show how it was received, if you show what the ordinary practice is of the business, is that sufficient? If they had put examples in front of the Court that they followed a similar course of conduct with respect to other payments, that likely would be sufficient. I think the one problem here, though, is that in Ms. Anderson's deposition testimony, she actually created the issue of fact. She – this is on page 142, line 6 of her deposition. She conceded, first, the July payment was processed a week after it was received by tag. And on page 145, line 6 through 18, she conceded that the same issue with respect to their ability to process the payment existed with respect to the May payment. So she, in effect, conceded that there would have been a delay because their system, by the time that it got to her department to process the check, would have considered the policy lapsed as of June 4th. So – and GreatWest came forward with no evidence demonstrating when they actually received the payment. They – in essence, what this does is it rewards the insurance company for poor record keeping. The only evidence they have is the date they processed the check without any further evidence as to when it actually came into the mailroom or was put into their post office box, and thus actually got into their possession. I would submit, you know, overall, however, that this is irrelevant, since based on the terms of the policy and the fact of payment prior to the expiration of the case period, that the payment here was effective upon mailing. Nothing further for the Court. Do you have any questions? Roberts. I don't see any. We've got a few minutes for rebuttal if you want to use it. Thank you. We'll hear from GreatWest at this time. Counselor? Mr. Ruby? Thank you, Your Honors. May it please the Court, Sam Ruby with Bulletin Hauser-Bailey for the respondent. Well, I'll follow the appellant's lead and address the two main issues in the case, those being the interpretation of the contract and then the question of whether there was a triable issue of fact as to when the check was received. Our position is that interpreting a premium to be paid as meaning it is received is the only reasonable interpretation under this contract. There is a temptation to dive into the grace period clause, pull out the word paid, and try to analyze it in the abstract and speculate as to what it might mean in some other context. But that's not the way contracts are interpreted. Every word in a contract has to be interpreted in relation to other words in the contract. The contract has to be read as a whole with an eye towards the function and purpose of the contract. But here in this contract, they certainly thought there was a difference between paid and received. I disagree, Your Honor. They use those terms in different places. But I, for example, could refer to the policy as a policy. I could refer to it as a contract. I'd still be referring to the same document. It's possible that two words can have the same meaning. That's the question that you have to decide. But the mere fact that different terms are used in different places does not necessarily mean that they are, that they mean something else. And in fact. But they may. Well, that's the question. And to test that, what you have to do is you have to examine the policy as a whole and understand how this policy works. This is not a normal insurance policy like an auto policy where the relationship is very simple. One person pays a premium. The other person provides insurance. The premium is the same every month. It's an auto and you just pay the premium directly and things go along. There is almost a banking relationship between these parties. There is something called a policy value account. And this account is the key to this contractual relationship. The account is the clearinghouse for all transactions between the parties. When money is sent to Great West, it doesn't just go directly on Great West books as payment of an obligation. What they call a premium in this case is a deposit into the policy value account. The only time Great West can touch that money is every month when the cost of insurance is due. And at that point, the automated systems go to the policy value account and they deduct whatever the cost of insurance is for that month. If there are other funds in that account, they earn interest. They can be borrowed against, in some cases, withdrawn. So what it means for a premium to be paid, this is where you need to start, is a deposit is made into the policy value account. We know from other terms in the policy that premiums are credited to the policy value account the day they are received. The policy makes that very clear. Under policy value account, which in our supplemental excerpts of record is at page 57, policy value account is described and then it says each premium, less the expense charge, will be credited to the policy value account on the date received. It says that the company is United States headquarters, but elsewhere in the policy, it says that they can also submit that to an authorized agent. So we don't dispute that they could send the premium to an agent. They don't have to send it to the headquarters. But it has to be received to be posted to the policy value account. Until funds are posted to the policy value account, they are essentially invisible to the relationship between these parties. And that leads me to my next point. Why would we even have a grace period scenario? Why does this even arise? It arises because if in a particular month the amount in the policy value account is insufficient to cover that cost of insurance deduction, there is a problem. The cost of insurance is the consideration that the company receives for this insurance. If the funds in the account are not sufficient to cover that, there is essentially a default. The grace period exists to grant the policy holder some time to cure that default. But let's remember what the default is. There have to be funds in the policy value account. It has to be replenished so that the company can make that deduction for the cost of insurance. At the end of the grace period, the company goes back to the policy value account to see if there have been sufficient funds replenished in the account to cover not only the cost of insurance that was due 60 days before, but also the additional cost of insurance that has been accruing during the grace period because the policy remains enforced during the grace period. If at the end of the grace period, you go to the policy value account and there's nothing more in it, the default has not been cured. And that is when the policy terminates. Now, suppose that as in this case, a check is mailed shortly before the expiration of the policy period, but it has not reached Great West or its agent. Under the policy, it cannot yet be credited to the policy value account. It is invisible to the relationship of the parties. It does not solve the problem that created the grace period scenario in the first place. Counsel, let's suppose the check was mailed 10 days in advance, but it got into the Lincoln Post Office and it didn't get delivered. What would your position be? Well, it's our position that it's the policyholder's obligation to ensure that the funds needed to pay the cost of insurance, their basic obligation of this policy are received by the company on the due date. So they have the obligation to get the funds there by the due date. Even though it's sitting in the post office. If they choose to use the mails, which they don't have to, and there was abundant evidence on this point of other methods that they could have used to forward these funds. But yes, if they choose to use the mails, they bear the risk. That is the holding in the Cornwell case. The Cornwell case said, unless there is a direction to pay, and the court defined that very narrowly, unless there's a direction to pay, if you use the mails, the risk of losing the check is on the policyholder. And it would follow that the risk of losing the check is on the policyholder. Certainly the risk of a delay in delivering the check would also be on the policyholder. Well, I think I understand your position. Okay. One other thing you shouldn't forget is the grace period comes up because there has already been a default. The policyholder can and arguably should proactively fund this account, should put funds in periodically, so you never have a situation where in a given month the cost of insurance is not there. But this is a privilege that is granted. But this is a privilege that is granted, and they can avail themselves of it. As Judge Seiler perceived, this had happened before in this account. It had happened the two years prior. The year immediately prior was the year when, again, there were insufficient funds and notice went out. In that case, Mr. Korbels waited to send the funds, but when he did send them, he sent them by overnight mail. But here he had four days. Well, it's his obligation, Your Honor, to ensure that those funds are delivered. How many days did he have on that occasion when he sent it overnight? I would have to do the math, Your Honor. I'm thinking it was more than one day, actually. That would have been cutting it pretty close, Your Honor. But there's another example as well. If you go back even the year prior, this happened again, where the funds were insufficient and notice went out. And on that occasion, Mr. Korbels immediately sent the funds. He didn't wait at all, and he sent them by certified mail. So he had been through this process a couple times before. He had found ways to get the check to Great West within the 60 days. As the evidence submitted also proved, there were other ways to deliver it. He could have wired it. He could have set up an automatic funding mechanism for this account, so he never would have had to even think about it. These were available. Was it available to him at any time to find out how much the fund had in it so that he would know sort of in advance, like on a computer or something like that? Yeah, there were two ways. First of all, every year he would get an annual statement. And those we put in the record there, the very first part of our excerpts of record is one of the first annual statements. And this would give a prediction of how the account was going to play out based on certain rates of interest, based on assumptions about how he would fund them. In addition, it had a toll-free number, and he could call that number at any time to say, hey, what's in the account? Or as Judge Fletcher says, he could simply wait for the past due notice, knowing that he would have 60 days to correct any default in that event. He didn't always have 60, but by the time he got the notice, it was a little less, right? It would be a little less, yes, yes. 40 or 50. Yes, yes. But there was no dispute in this case that he got the notice, and he got it quite promptly. You know, there are cases which put a lot of stress on the insurance company's conduct and not returning the check. You hung on to that check for a long, long time. They held on to it longer than I would have liked, Your Honor, and I had some discussions with my client about tidying up their procedures, but my first answer to that, Your Honor, is the cases you're talking about are cases that deal with the doctrine of waiver. And the issue in those cases is, assuming that there was a termination, did the company subsequently waive its right to enforce the termination by virtue of its conduct? In the proceedings below, even though I was anticipating it might come up, there was no argument of a waiver. If you look at the motion that was filed by Corbels for partial summary judgment, and if you look at his opposition to our motion for summary judgment, you'll see there's no section in there that says Great West Life waived its right to enforce the termination. They didn't argue that. In looking at that, I was thinking, they say that they processed the check on the day they got it, June 4, but here they make a mistake and wait months before they send the check back. Now, maybe they weren't so cautious when they get checks as to when they process them. I mean, there's no absolute record that they actually didn't receive this check until June 4. Well, I'll get to the receipt issue in a minute as to the return of premiums. Again, I don't want to take on more than I have to. That argument was not raised below. It was not raised in the opening brief, so I didn't brief it in my response. If you're interested, though, if you go to the declaration of Don Galley that was submitted, as well as the declaration and testimony of Pam Anderson, they discuss in those declarations what happened with the check, why it was held. It was because there was a pending request for reinstatement, and their procedure is when that's pending, they hold on to the money until the decision is made, and then if it's declined, they return it. But again, that's an issue that's well beyond anything that was briefed or argued either below or in the principal briefs here. One more point before I move on to the receipt issue, or two or three. The Pearson case, the Nelson case that was cited here, the Nelson case was cited in the reply brief, so I didn't have an opportunity to discuss it in my response to the brief, but my response would have been the same as to the Pearson case. They're both waiver cases. If you look at those cases, the issue was not how to interpret the policy or whether there had been compliance with the policy terms. In fact, it was assumed in both of those cases that there had been noncompliance, and the issue quite explicitly framed in each of those questions was notwithstanding the noncompliance with the policy terms, could the insurer terminate the policy given its past conduct? Those were waiver cases where there was ample evidence that for years, those insurers had been accepting late premiums, had not been insisting on strict compliance with the grace period clauses, and the court said, you know, why after five years did you suddenly say it was too late? And the court said, in those cases, we find a waiver. Here, there's no evidence that Great West ever previously reinstated a policy after receipt of a premium beyond the grace period. On the contrary, the evidence that we have from the prior occasions is that Mr. Korbel has made every effort those times to get the money to Great West before the expiration so that it wouldn't terminate at all. On the question of the receipt of the check, this is, first of all, an interesting question of the burden of proof. Our position was that because the plaintiff was suing for breach of contract, it's their obligation to prove satisfaction of all conditions in the contract. And one of the conditions in the contract, in our view, is that the premiums be paid within the grace period in order to satisfy the terms. So it was our position that the burden of proof on the issue of whether the premium was paid was actually on Mr. Korbel's. The district court agreed with that, and you'll find that explicit ruling in the district court's opinion. And that ruling was not explicitly, as far as I can tell, raised on the appeal. It was not in the statement of issues. There was no section in the appellant's opening brief on the burden of proof. As a precaution, I dropped a footnote in my respondent's brief just saying, bringing that ruling to your attention, but saying it hasn't been argued, so I'm not going to respond. So that's the first issue, and that's important because on summary judgment, the burden is a little different depending upon who has the burden of proof. He says, I mailed it on May 28. Doesn't that then impose a burden on you to say when it was received? No, I don't think so, Your Honor. I think that assuming you reach the interpretation that the receipt date is the critical date, then it's our position that the burden of proof on that issue is with the plaintiff because it's a condition that they have to satisfy. Having said that, I don't rely on that because I think the evidence here was sufficient to meet the burden of proof wherever it lay. Custom and practice evidence is well established as admissible evidence to prove that something happened in a particular occasion. Now, you have to submit the right evidence. You have to submit competent testimony by someone familiar with the custom and practice that establishes that there is such a custom. And we did that in spades with the declaration of Pam Anderson. Also, there was deposition testimony submitted by both sides that amplified it. And this is very important. There was no objection posed by Mr. Korbels under Rule 406 to that testimony. He did object that Ms. Anderson lacked personal knowledge of the standards. And the district court weighed that off saying, what do you mean? She runs the department. She made up the standards. Of course, she knows what the custom and practice is. But Mr. Korbels never objected that the evidence was insufficient to establish a custom and practice. The first time they've ever made that objection is in the reply brief in this appeal. Now, it's also not a good objection because, again, the evidence submitted by Ms. Anderson was more than ample to establish a custom and practice of processing these routine premium checks the same day they are received. Having submitted that evidence, the burden then fell to Mr. Korbels to come forward with something else that would create a tribal issue of fact. The check went from where to where? It went from San Francisco to Lincoln, Nebraska. And Mr. Korbels' response was twofold. First of all, he questioned whether custom and practice evidence is probative. And we addressed that as a matter of law. Then he speculated that, well, but all kinds of things could have happened to this check. Maybe you have a custom and practice, but maybe something else happened.  It's not enough to defeat a motion for summary judgment. It's not enough to simply speculate that something else happened. You have to show that you have some hope of proving that something else happened. And here there was no evidence on that point. What they tried to do was they tried to use the handling of the second check, the reinstatement check, to call into question the handling of the first check. But I submit to you that it backfired. And the district court noticed this very closely. When the second check came in, it was given a different stamp. It was stamped received. And the reason is that they did not immediately process that check. And they have a custom and practice that when they get a check and they don't immediately process it, they put that receive stamp on it. The first check doesn't have a receive stamp on it. It has the usual stamp that they apply when, in fact, they process it the same day. So looking at the- Did a witness testify to that? That was, yes. Ms. Anderson, who runs the department, she explained all of that, both in her declaration and in deposition testimony that was before the court. And the district court goes through that in some detail in its order. Well, I think I've covered the points that were raised here. So unless there are any further questions, Your Honor, I'll submit. I don't see any. Thank you for your argument, counsel. A few minutes for rebuttal. Thank you, Your Honor. I'll try to be brief. To address first the question of policy interpretation, a Great West interpretation that paid means received, credited to the policy value account, and deducted as cost of insurance puts both an unreasonable, if not an impossible, burden on the insured to be responsible for things that it has no control over. Great West has all of the control over the policy value account. Once the insured mails his premium or otherwise sends his premium to Great West, he loses control over what Great West does with it. Because Great West doesn't need to apply a payment to the policy value account until it's actually received at the United States headquarters, and I think we drew the distinction between where an insured may send the premium versus what Great West does with it after it's received, when they do that, it can actually be much later, much past the date that it's actually sent by the insured. I think, as Judge Fletcher pointed out, an insured could mail a premium on April 8th, the day he received the past due notice in this case. If Great West didn't receive it until June 1st, the policy would be terminated, and Great West, as your counsel has argued, would say that the insured has no recourse under the policy. It's the insured's obligation. It's simply unreasonable to put these obligations on the insured over matters over which they have no control. Robertson, But your client seems to have assumed that duty in prior instances. I don't think that's the case. Robertson, In other words, I'm not sure how relevant his subjective intent is to this issue, but the fact is on a couple of prior occasions when he was sneaking up or edging up on the deadline, he used something other than what the kids call snail mail to send the payment in, right? Well, Your Honor, on one occasion he used express mail, yes, which was faster. On the other occasion he used certified mail, which in fact is slower than U.S. mail. So I don't think there's any consistent pattern or practice. Did he attempt to – did he always send a payment prior to the expiration of the grace period? Yes. I think that's established here. Great West hasn't come forward with any evidence of receipt of any of the payments, whether it's the one in 2000, the one in 2001, or the one in 2002. It's not until we get to the reinstatement payment in July of 2002 that we actually have some evidence of when Great West actually received the letter in their offices. Now, Great West counsel cited the Cornwell case. I just wanted to clarify with the Court that that case involved a check that was never received by the creditor, and the payor sought credit for a payment that was actually never received. So they didn't want to make the payment good. They simply said, we sent you the check on this date, it's good as payment, period. There's no forfeiture of my mortgage in this case. It's a much different situation here where the payment was beyond doubt received by Great West and put into their account. Now, if I may address briefly just the receipt issue, as pointed out, you know, Ms. Anderson did submit a fairly self-serving declaration on summary judgment, which was not exactly consistent with her deposition testimony. As I pointed out in my opening argument, she did, in fact, admit that the two payments, the payment that they processed on June 4th and the payment that they processed in July, were both in the same category. Great West could not or TAG could not process those payments as they were received. So because their systems indicated that the policy was lapsed in both instances, so they had to hold the payment for a number of days. For the July payment, I should also clarify, both checks bear the same stamp. But for the July check, we know because the letter bears a different stamp that it was received seven days prior to the date that the check was processed. For the June payment, there's no similar evidence. And the Court took this issue away from the jury. He weighed the evidence and decided, you know, weighed the inferences based on that evidence and decided the issue in favor of Great West to say that he felt that the payment was actually not received until June 4th. We submit that the evidence doesn't support that, and it should be submitted to a jury on that issue. Submitted, Your Honor. Roberts. Thank you for your argument. Thank you, both sides, for their argument. Very interesting case. It's submitted for decision, and the Court will stand adjourned. Thank you. All rise. This Court, for this session, stands adjourned. Thank you.
judges: B. Fletcher, Siler , Hawkins